UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRYSTAL TAMARA CONKLIN,

                        Petitioner,                            Case Number 2:12-CV-10385
                                                        Honorable Paul D. Borman

v.

MILLICENT WARREN,

                        Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Crystal Tamara Conklin filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Macomb Circuit Court of first-degree murder, MICH. COMP. LAWS § 750.316, and first-degree child abuse. MICH. COMP. LAWS § 750.136b(2). The trial court sentenced her to life imprisonment for the murder conviction and 9-to-15 years for the child abuse conviction. The petition raises six claims: (1) Petitioner was denied the effective assistance of counsel at trial; (2) the prosecutor committed misconduct; (3) the trial judge erroneously engaged in ex parte communications with a juror and gave incorrect jury instructions; (4) insufficient evidence of Petitioner's intent was presented at trial to sustain Petitioner's convictions; (5) Petitioner's Fifth Amendment rights were violated by the admission of her involuntary statements; and (6) Petitioner's convictions for both first-degree murder and first-degree child abuse violate her rights under the Double Jeopardy Clause. The

Court finds that none of the claims have merit. The petition will therefore be denied. The Court will also deny Petitioner a certificate of appealability.

## I.

Petitioner's convictions stem from the death of her 33-month-old son, Sean Sowards.

At trial, the evidence established that Petitioner lived together with Michael Sowards and their two young children, Sean and Angelique. In the Spring of 2007, the family moved from a motel into a residence in Warren, Michigan.

Sowards testified that on the morning of June 11, 2007, he left for work at about 6:30 a.m. He telephoned Petitioner during the day, and she did not indicate that there were any problems at home. Sowards left work at around 4:30 p.m. and drove to his uncle's house to repair the brake line on his car. He arrived home at approximately 7:30 p.m.

When Sowards arrived at the front door, he was greeted by Petitioner who informed him that Sean had been vomiting, and she was not sure what was wrong. Sowards went to Sean's room and found him lying face down on his mattress. Sowards could not rouse Sean, whose breathing seemed to be very shallow. Sowards opened one of Sean's eyes, and he saw that the pupil was dilated. Sowards cursed at Petitioner and told her that they had to take Sean to the hospital immediately.

Sowards drove the car while Petitioner held Sean in the back seat. When they

2

arrived at the hospital, Sowards grabbed Sean and ran inside. He told Petitioner to take

Angelique home and come right back to the hospital. Sowards telephoned Petitioner

several times when Sean was transferred to another hospital, but Petitioner never came

back to the hospital that evening.

Meanwhile, Petitioner and Angelique had driven to Petitioner's uncle's house.

Matthew Conklin testified that when Petitioner arrived, she told him that Sean had fallen

and that he was at the hospital. Conklin asked Petitioner why she was not there with him,

and Petitioner responded that if she went to the hospital she would be arrested. Petitioner

asked Conklin questions about seizures, and he told her to go to the hospital. When

Petitioner drove away, Conklin assumed that she was driving to the hospital.

Dr. Steven Ham, a pediatric neurosurgeon, treated Sean. Dr. Ham described Sean

as being critically ill, and he determined after a CAT scan that there was a blood clot on

Sean's brain. Dr. Ham performed surgery to remove the clot, but he nevertheless expected

Sean to die. Dr. Ham opined that the blood clot was caused by blunt force trauma.

Marnie Vandam, a forensic nurse examiner, examined Sean on the morning of

June 12, 2007. Sean was unconscious and on a ventilator. He had a swollen and raised

scabbed wound on his forehead. He had different colored bruises on his face. Both of his

eyes were swollen and red. He had an inflamed wound on the back portion of his left ear.

He had a series of reddened scratches and bruises on his back and buttocks. He had a

large bruise on his left arm. He had a greenish bruise on the back of his left leg, and a

3

yellow bruise on his left ankle. He had a brown colored scar on his left thigh, and abrasions and bruises on his right leg.  Both of Sean's hands and feet were also bruised, and he was missing both big toe nails.

Dr. Marcus Degraw, the medical director of the hospital's Child Protection Team, also examined Sean on the morning of June 12, 2007. He testified that Sean was very small for his age, and he had not gained any weight since he was 15 or 16 months old. He opined that a parent would have "to work hard to make a child not gain weight like that." Tr. 4-18-2008, 215. He characterized the lack of weight gain as more than mere neglect. Dr. Degraw said he had never seen so much bruising on a child, including children he had treated with bleeding disorders.

Dr. Degraw opined that the injuries were "evidence of not only repetitive trauma, but . . . a point of punishment." Tr. 4-18-2008, 201-202. Dr. Degraw found that Sean was abused ultimately in a singular event that caused his death. Given Sean's sister's good physical condition, Dr. Degraw concluded that Sean "seemed to be a target for some reason where he was repetitively traumatized with the toenails and the abusive head trauma, and the bruising . . . and underweight and underfed."  Id. 216, 217.

As part of the examination Dr. Degraw spoke with Petitioner and Sowards to obtain a medical history. Petitioner told Dr. Degraw that she was home with Sean on the 11th and that he was acting normally until the mid-afternoon. Petition said that Sean became groggy and asked to take a second nap.  Petitioner told Dr. Degraw that she

checked on Sean between 5:00 and 6:00 p.m., and tried to give him a bottle, but Sean "chucked" the bottle across the room and vomited. Petitioner said that from the point on, she did not leave Sean until he was dropped off at the hospital.

Sowards told Dr. Degraw that when arrived home between 7:30 and 8:00 p.m., that Sean was unresponsive, lethargic, and grunting. He immediately took Sean to the hospital.

Dr. Degraw testified that given the injuries he saw on Sean, he expected the parents to relate to him a horrible traumatic accident involving massive trauma. He opined that the trauma necessary to result in the injuries would have prevented Sean from playing with his sister, chucking his bottle, or telling his mother that he wanted to take a nap. The parents, however, both denied that Sean had any falls in the previous 24 hours.

Dr. Edward O'Malley, a pediatric opthalmologist, examined Sean's eyes. Dr. O'Malley opined that Sean's eyes were severely compromised due to damage to the corneas. This could have been caused by chronic malnourishment or exposure to chemicals.

Soon after Sean arrived at the hospital, officers from the Warren Police Department were sent to Petitioner's residence. Officer Marlene Neidermeier arrived at the residence. Petitioner and her daughter answered the door and allowed the officers to enter. The officer told Petitioner that she was there for a welfare check on Petitioner's daughter because of Sean's injuries. Petitioner did not inquire into Sean's condition.

5

Two detectives then arrived with a search warrant. They found blood splattered on a pile of dirty laundry in the laundry room, and wet clothes that smelled strongly of vomit. A metal pipe with a rubberized handle was seized from the kitchen window sill. Officers also found stains that tested positive for blood on two walls and the carpeting in Sean's room. The bottom of Sean's mattress was also stained with what appeared to be blood.

Petitioner told one detective that Sean was groggy during the day and did not want to eat. She told the detective that when she checked on Sean after 4:30 p.m., he had thrown up and was unresponsive. When Sowards arrived home, they drove Sean to the hospital.

On June 12, 2007, Matthew Conklin spoke with Petitioner at the hospital. Petitioner was distraught about what the police were going to do. When Conklin visited Sean, he saw that Sean appeared to be much smaller than nine months previously. He asked Petitioner about Sean's bruising, and Petitioner said they had been caused by an allergic reaction.

Sean died at the hospital on June 13, 2007. The medical examiner testified that the cause of death was blunt head injuries. That day, a detective interviewed Petitioner at the police station for three hours. She claimed, for the first time, that Sean had slipped and fell on the bathroom tile, and that his body was bruised because of how clumsy he was. Petitioner affirmed that Sowards was out of the house the whole day. At the end of the

interview, when the detective confronted Petitioner about inconsistences in her statements, Petitioner stated that Sean had fallen from the bathroom sink onto the floor when she was cleaning out his eyes. Petitioner never asked about Sean's condition during the interview, so a detective informed her that Sean had passed away.

Testimony was also presented regarding Petitioner's prior conduct with Sean. Sowards testified that in January of 2006, when Sean was only four months old, Petitioner spanked Sean and thought it was funny that his head bobbled when she did so. Sowards' mother learned of this and filed a complaint with Children's Protective Services.

In early June of 2007, Sowards saw that Sean had a cut on his forehead. He also noticed that Sean was missing his big toe nails. When Sowards told Petitioner that Sean should be taken to a doctor, she said that the children would be taken away if she did so.

On three prior occasions, the family moved in with Matthew Conklin. He testified that Petitioner kept Sean in a playpen in a dark basement during the day. When Conklin expressed his concern, Petitioner moved the playpen into the garage. If Sean was not in the basement or garage, Petitioner would strap him into a car seat and cover him with blankets.

Petitioner testified in her own defense, suggesting for the first time that Sowards caused Sean's death. She testified that on the day of the incident, Soward arrived home at 4:30 p.m., screamed at Sean, and then left him lying in his bed. The prosecutor impeached this testimony with Petitioner's prior statements to police which never mentioned this

7

incident.

Based on this evidence, the jury found Petitioner guilty of first-degree murder and first-degree child abuse.

Following her conviction and sentence, Petitioner filed a motion for a new trial. An evidentiary hearing was held in the trial court regarding her claims of ineffective assistance of counsel. Petitioner's trial counsel, her uncle Robert Conklin, and Petitioner testified at the hearing. After post-hearing briefing, the trial court denied the motion for a new trial. *People v. Conklin*, No. 07-004032-FC, Order (Macomb County Cir. Ct. Jun. 2, 2009)

Petitioner then filed a claim of appeal through retained counsel. Her brief on appeal raised the following claims:

I. The trial court judge engaged in undisclosed communications with a seated juror. This was a critical stage of trial because defense counsel's presence would have contributed to the fairness of the procedure. Because counsel was totally absent during this proceeding, the trial was structurally unfair, mandating a presumption of prejudice, and requiring automatic reversal.

II. The prosecutor engaged in misconduct by failing to disclose a promise she made to Michael Sowards in exchange for this testimony against his girlfriend. The prosecutor failed to correct the testimony of Michael Sowards when he testified that he was given no promises for his testimony and the prosecutor knew his statements were false, violating defendant's right to due process.

III. The prosecutor presented insufficient evidence that defendant had the requisite intent to commit either first degree child abuse or felony murder.

IV. The jury instructions failed to expressly provide that defendant's acts

8

must be the cause of death, violating defendant's right to due process of law. The trial court reversibly erred in instructing the jury that defendant could be convicted if the child "died of blunt head injuries," omitting the stipulated instruction which added the words "by Crystal Conklin."

V. Defendant was deprived of the effective assistance of counsel in violation of the Sixth Amendment through a series of acts and omissions by trial counsel.

VI. Convictions of defendant on both felony murder and the underlying offense of first degree child abuse violate the prohibitions against double jeopardy.

VII. The trial court abused its discretion and deprived defendant of the potential of a fair trial and due process of law in granting the prosecutor's motion to introduce "other bad acts" evidence under Michigan Rule of Evidence 404(B).

VIII. Defendant's statements were involuntary based on the totality of circumstances.

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *People v. Conklin*, No. 286270, 2010 WL 2384876 (Mich. Ct. App. Jun. 15, 2010).

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court. But the application was denied because the court was not persuaded that the questions presented should be reviewed by the Court. *People v. Conklin*, 488 Mich. 1038 (2011) (table).

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an

9

application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state-court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1)-(2).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).   An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.   A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that

10

state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*.

    "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.  Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the  Supreme Court's precedents. *Id*. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against

extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)).   Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford*, 537 U.S. at 24.   In order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.

## III.

## A.

Petitioner first asserts that she was denied the effective assistance of trial counsel. Specifically, she asserts that counsel had received a favorable report from an independent pathologist, Dr. Bader Cassin, and as a result, counsel should have called him as a defense witness. She also claims that counsel failed to investigate and present a defense that Sowards caused Sean's death. Finally, she claims that counsel made a number of other errors at trial involving the failure to object to the admission of evidence, eliciting unfavorable testimony, and failing to move for a change of venue. Respondent asserts that the claim was reasonably adjudicated on the merits by the state courts.

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466

U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id*.

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

13

In this case, after an evidentiary hearing was held in the trial court, the Michigan

Court of Appeals denied relief with respect to Petitioner's ineffective assistance of

counsel claim by examining each of his allegations and rejecting them on the merits after

conducting a thorough analysis:

> Defendant next argues that she was denied the effective assistance of
> counsel for several reasons. We disagree. "Whether a person has been
> denied effective assistance of counsel is a mixed question of fact and
> constitutional law." *People v. LeBlanc*, 465 Mich. 575, 579; 640 NW2d 246
> (2002). This Court reviews the trial court's factual findings for clear error
> and questions of constitutional law de novo. *Id.*

> To establish a claim of ineffective assistance of counsel, a defendant
> must demonstrate that his counsel's performance fell below an objective
> standard of reasonableness and that counsel's representation so prejudiced
> the defendant that it deprived him of a fair trial. *People v. Pickens*, 446
> Mich. 298, 302-303; 521 NW2d 797 (1994); *People v. Moorer*, 262
> Mich.App 64, 75-76; 683 NW2d 736 (2004). With respect to the prejudice
> requirement, a defendant must demonstrate a reasonable probability that,
> but for counsel's errors, the result of the proceeding would have been
> different. *People v. Toma*, 462 Mich. 281, 302-303; 613 NW2d 694 (2000);
> *Moorer*, 262 Mich.App at 75-76. A defendant must also overcome the
> strong presumption that counsel's actions constituted sound trial strategy.
> *Toma*, 462 Mich. at 302.

> Defendant first argues that counsel was ineffective for failing to
> move for a change of venue because of extensive pretrial publicity. A
> change of venue may be granted where justice demands or where statutory
> law provides. *People v. Jendrzejewski*, 455 Mich. 495, 499-500; 566 NW2d
> 530 (1997). Community prejudice based on extensive, highly inflammatory
> pretrial publicity can constitute a circumstance warranting a change of
> venue where such prejudice amounts to actual bias and the inflammatory
> pretrial publicity saturates the community to such an extent that the entire
> jury pool is tainted. *Id.* at 500-501.

> Here, the record shows that the jury pool was not tainted by
> extensive pretrial publicity. Defense counsel testified at the *Ginther* hearing

14

that there was very little publicity in this case other than during the two or three days following the child's death. The trial court also determined that the pretrial publicity was limited and restricted to defendant's preliminary examination, which occurred approximately eight months before trial. In addition, both the trial court and defense counsel indicated that none of the prospective jurors had heard about this case. Thus, the record fails to show that inflammatory pretrial publicity tainted the jury pool. As such, defense counsel was not ineffective for failing to move for a change of venue. Defense counsel does not render ineffective assistance by failing to assert futile arguments. *People v. Snider*, 239 Mich.App 393, 425; 608 NW2d 502 (2000).

Defendant next argues that counsel was ineffective for failing to call certain lay witnesses, including a witness who could corroborate Sowards's acts of violence against defendant and the child at the Sunnybrook Hotel. "Decisions regarding what evidence to present and whether to call or question certain witnesses are presumed to be matters or trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v. Davis*, 250 Mich.App 357, 368; 649 NW2d 94 (2002).

Defense counsel testified that he hired Michael Burn, a private investigator, who spoke with John Johnston at the Sunnybrook Motel. Johnston indicated that he called the police regarding a commotion in the hotel room, but he did not know what occurred and did not observe any assault. Because Johnston could not have corroborated defendant's claim that Sowards was violent toward her, counsel's failure to call Johnston was not objectively unreasonable. *Davis*, 250 Mich.App at 369. Further, the record does not support defendant's assertion that she informed counsel of other potential witnesses from the Sunnybrook Hotel, including "Randy," "Jerry," "Steve," and "Sarah."

Defendant also argues that counsel was ineffective for failing to call a neighbor who lived next door to defendant's home at 2215 Jarvis who could testify that Sowards came home after work on June 11, 2007. Defense counsel testified that Burn attempted to go to 2217 Jarvis, but discovered that the address did not exist. Burn went to 2207 Jarvis, but nobody was at that residence. He then searched a database and discovered that Molly Thompson owned the residence at 2207 Jarvis. He called the home and spoke to Shane Vanostrand, Thompson's husband, who recalled defendant

15

but did not have any specific recollection of the events that occurred on June 11, 2007. Because defense counsel's investigation revealed that Vanostrand could not have testified that Sowards came home after work on June 11, 2007, defendant again has failed to establish that counsel's failure to call him was objectively unreasonable. *Davis*, 250 Mich.App at 369.

Defendant also complains that counsel failed to subpoena her brother, Craig Conklin. At the *Ginther* hearing, defense counsel did not recall defendant asking him to subpoena Craig and testified that he represented Craig a few times in court and that Craig still owed him money. Counsel emphatically denied that he refused to call Craig to testify because Craig owed him money. Defendant contends that Craig's testimony would have corroborated her testimony and contradicted Sowards's testimony. In particular, defendant references a Sterling Heights Police Department dispatch log that appears to reflect that Craig called the police on one occasion after defendant had called him and told him that Sowards had kicked in the bedroom door and assaulted her previously. Even if counsel had refused to subpoena Craig contrary to defendant's request, as she claims, defendant has not overcome the presumption that counsel's decision not to call Craig was reasonable sound trial strategy. *Davis*, 250 Mich.App at 369. The record does not indicate in what capacity counsel represented Craig previously, and Craig may have been subject to impeachment had he testified. Moreover, the dispatch log refers to an incident that occurred on June 19, 2005, at an address in Sterling Heights. Thus, Craig's testimony would not have assisted the jury in determining the events that occurred on June 11, 2007, or defendant's treatment of the child during the two years previous to that date. Accordingly, defendant has not shown that she was prejudiced by counsel's failure to subpoena Craig. *Toma*, 462 Mich. at 302-303; *Moorer*, 262 Mich.App at 75-76.

Defendant also argues that counsel was ineffective for failing to call her uncle Ronald Conklin to testify. Counsel testified that he spoke to Ronald, but Ronald declined to testify. Counsel claimed that he sought to question Ronald about an altercation that he had with Sowards, but Ronald refused to testify about the incident. At the *Ginther* hearing, Ronald initially denied that he refused to testify and claimed that he would have done so had he been called to testify at trial. On cross-examination, however, he admitted that his name was on defense counsel's witness list and that counsel sought to present his testimony. Ronald also admitting declining to testify:

16

Q. And, at some point in time, you indicated you would rather not testify, is that correct?

A. Yes, ma'am.

Q. So, you did have an opportunity to speak at the trial and chose not to, is that correct?

A. Yes, ma'am.

In light of this record, defendant has failed to rebut the presumption that counsel's failure to call Ronald as a witness was sound trial strategy. *Davis*, 250 Mich.App at 369.

Defendant further argues that counsel was ineffective for failing to subpoena various other lay witnesses, including Tammy Stockum, William Malinzack, Bryan Swan, Jeremy Schiefka, and police officers who were called to specific residences. At the *Ginther* hearing, counsel denied that defendant asked him to call these witnesses. More importantly, defendant did not establish the substance of the witnesses' purported testimony or explain how their testimony would have assisted her defense. A defendant "may not merely announce his position and leave it to this Court to discover and rationalize the basis for [her] claims...." *People v. Matuszak*, 263 Mich.App 42, 59; 687 NW2d 342 (2004) (citation and quotations omitted). Thus, once again, defendant has not overcome the presumption that counsel's failure to call the witnesses was sound trial strategy. *Davis*, 250 Mich.App at 369.

Defendant next argues that counsel was ineffective for failing to call Dr. Bader J. Cassin to testify. Counsel admitted that he hired Dr. Cassin, who had given counsel a letter stating that Dr. DeGraw had exaggerated the description and character of the child's injuries and that defendant's explanation of the cause of the injuries was at least credible. The letter further stated that the characterization of the injuries as resulting from nonaccidental trauma may be incorrect. Counsel admitted that Dr. Cassin's testimony could have "possibly" impeached Dr. DeGraw's testimony and supported defendant's theory that she did not intentionally harm her son. Counsel listed Dr. Cassin's name on his witness list, but when he spoke to Dr. Cassin before trial, Dr. Cassin stated that he would not be able to assist in the matter. As a result of that conversation, counsel elected not to call Dr.

17

Cassin to testify. Thus, the record indicates that counsel decided not to call Dr. Cassis as a matter of strategy, and defendant has not rebutted the presumption of sound strategy. *Davis*, 250 Mich.App at 369.

Defendant next argues that counsel failed to effectively cross-examine Sowards regarding his physical abuse of the child. Counsel denied that defendant informed him of any physical abuse that Sowards inflicted on the child at the Sunnybrook Hotel. Rather, counsel testified that defendant informed him only that Sowards had physically abused her at the hotel. Counsel also denied that defendant informed him that Sowards had flipped the child upside side when he was buckled into his car seat or flipped him onto the floor. Counsel admitted that defendant had indicated that Sowards inflicted physical violence on the child on one or two occasions. As counsel explained, however, he did cross-examine Sowards regarding his physical abuse of the child during trial, but Sowards denied that he abused the child. Although defendant complains that counsel failed to effectively cross-examine Sowards so as to elicit an admission regarding his physical abuse of the child, this did not render counsel's performance below an objective standard of reasonableness. *Pickens*, 446 Mich. at 302-303; *Moorer*, 262 Mich.App at 75-76.

Defendant next argues that counsel failed to effectively cross-examine Sowards regarding his motivation to testify. Counsel testified that he cross-examined Sowards regarding his second-degree child abuse charge, but he was not privy to any agreement between Sowards and the prosecution. In addition, defendant contends that counsel failed to discover and investigate Sowards's criminal record involving theft or dishonesty. Defendant references a 2001 conviction for retail fraud. But even if counsel had further cross-examined Sowards regarding his motivation to testify or presented evidence regarding Sowards's 2001 retail fraud conviction, it is not reasonably probable that the result of trial would have been different. *Toma*, 462 Mich. at 302-303; *Moorer*, 262 Mich.App at 75-76. Thus, defendant has not established the requisite prejudice to establish a claim of ineffective assistance of counsel.

Defendant next argues that counsel was ineffective for failing to present medical evidence regarding acute dermatitis, Apraxia, and the fact that defendant took the child to the Plumbrook medical facility for treatment of his dermatitis in February 2006. Counsel testified that he received a copy of the Plumbrook medical records but was unaware of a

18

condition known as acute dermatitis until after trial. Counsel also testified that he was not familiar with a condition known as Apraxia. Thus, counsel could not have presented evidence regarding acute dermatitis or Apraxia at the time of defendant's trial. Moreover, considering that the child died of blunt head injuries, defendant has not demonstrated that she was prejudiced by counsel's failure to present evidence that defendant took the child for treatment regarding his dermatitis. *Toma*, 462 Mich. at 302-303; *Moorer*, 262 Mich.App at 75-76.

Defendant next argues that counsel was ineffective for failing to cross-examine Sowards's mother, Elizabeth Herd, regarding her failure to seek medical treatment for the child while he was in her care for several days. Defendant has not demonstrated that Herd's failure to seek medical treatment could have assisted her defense. Further, counsel testified that defendant never informed him that Herd had physical custody of the child on occasion and an opportunity to seek medical treatment for him. Accordingly, this claim cannot succeed.

Defendant next contends that counsel was ineffective for allowing the prosecutor to call Dr. Daniel Spitz to testify out of turn, at the conclusion of the case. As defense counsel explained, and the trial court recognized, calling witnesses out of order is a common trial practice that does not impact the trial. The jury was instructed to treat all evidence fairly. Thus, defendant has failed to establish either deficient performance or resulting prejudice with respect to this claim. *Toma*, 462 Mich. at 302-303; *Moorer*, 262 Mich.App. at 75-76.

Defendant next argues that counsel was ineffective for failing to move to suppress defendant's statements to the police. Counsel testified that he did not seek suppression of defendant's police statements because she made no admissions in the statements and showed extreme emotion when she was informed that the child had died. Counsel believed that defendant's recorded statement would assist her defense. Defendant has not overcome the presumption that counsel's decision was sound strategy. *Toma*, 462 Mich. at 302. Moreover, as discussed in section VIII, infra, any motion to suppress would have been futile. Counsel is not ineffective for failing to make a futile motion. *Snider*, 239 Mich.App. at 425.

Defendant next argues that counsel was ineffective for failing to assert a battered woman syndrome defense. We again disagree. In *People v.*

19

*Christel*, 449 Mich. 578, 580; 537 NW2d 194 (1995), the Court explained:

> Generally, battered woman syndrome testimony is relevant
> and helpful when needed to explain a complainant's actions,
> such as prolonged endurance of physical abuse accompanied
> by attempts at hiding or minimizing the abuse, delays in
> reporting the abuse, or recanting allegations of abuse.

Thus, battered woman syndrome testimony arguably may have been
helpful to explain why defendant did not initially disclose her contention
that Sowards returned home from work at approximately 4:30 p.m. on June
11, 2007, and screamed at the child. But such testimony would not have
otherwise supported her defense that she did not intentionally injure the
child or show that Sowards, rather than defendant, caused the child's head
injuries. Furthermore, during trial, defendant testified about Sowards's
physical abuse directed toward her. She asserted that she was afraid to tell
the police that Sowards came home after work because she was scared of
what he would do to her and her unborn child. Thus, because defendant
presented evidence of Sowards's physical abuse at trial, including her
reasons for not immediately implicating Sowards, she has not demonstrated
that she was prejudiced as a result of counsel's failure to assert a battered
woman syndrome defense. *Toma*, 462 Mich. at 302-303; *Moorer*, 262
Mich.App at 75-76.

Defendant next argues that counsel was ineffective for allowing
certain witnesses to offer testimony based on hearsay and speculation.
Defendant specifically challenges Dr. Edward O'Malley's testimony that the
child's eye problems could have been caused by malnourishment, Detective
Marsee's testimony that defendant did not ask other police officers about the
child's condition because she was not in the presence of other officers while
she was detained, and Magnan's testimony that defendant beat the child, did
not like him, did not want him, and was mean to him. Defendant's argument
lacks merit because the witnesses did not testify based on hearsay and
speculation. Dr. O'Malley offered a medical opinion that chronic
malnourishment could cause the type of eye problem that the child
experienced. Marsee's testimony was not speculative because it was based
on his knowledge that defendant was being detained in a secluded area.
Magnan's testimony simply described the allegations contained in a CPS
complaint made in 2005. Thus, defendant has not established that counsel
was ineffective for failing to object to the testimony, given that any

20

objection would have been futile. *People v. Milstead*, 250 Mich.App 391, 401; 648 NW2d 648 (2002).

Defendant next argues that counsel was ineffective for failing to introduce the child's birth certificate as evidence. Defendant contends that the space indicating the father's name on the birth certificate was left blank because Sowards claimed that he was not the child's father and would not accept responsibility for him. Considering the overwhelming evidence against defendant, evidence that Sowards was not listed as the child's father on his birth certificate would not have affected the outcome of the proceeding. Thus, defendant was not prejudiced. *Toma*, 462 Mich. at 302-303; *Moorer*, 262 Mich.App at 75-76.

Finally, defendant argues that counsel was ineffective for failing to object at sentencing to information in the presentence investigation report (PSIR) that the child was blind. The PSIR stated that the child "had an eye infection in both eyes which caused him to become blind[.]" The PSIR also reflected a medical opinion that the child suffered "severe malnourishment which caused the infection to both eyes resulting in blindness." These statements were consistent with the trial testimony. Dr. O'Malley testified that the child's vision was severely compromised and that he might be able to count fingers in front of him only at a very close range. Dr. O'Malley opined that chronic malnourishment could cause the cornea problem that the child experienced. Further, defendant admitted at trial that the child could "barely see" and that she told the police officers that he was unable to see. Accordingly, because the testimony supported the indication of the child's blindness in the PSIR, counsel was not ineffective for failing to object. *Milstead*, 250 Mich.App at 401.

*People v. Conklin*, 286270, 2010 WL 2384876 (Mich. Ct. App. June 15, 2010).

Considering the deferential standard of review of claims adjudicated on the merits

in the state court, Petitioner has not demonstrated entitlement to habeas relief based on his

ineffective assistance of counsel claims. The Michigan Court of Appeals stated the

corrected governing standard, and it applied it in a well-reasoned and thorough manner to

the facts of Petitioner's case. It is difficult to characterize this comprehensive analysis of

Petitioner's ineffective assistance of counsel claims as anything other than at least

reasonable.

As recently explained by the Supreme Court, *Strickland* establishes a high burden

that is difficult to meet, made more so when the deference required by § 2254(d)(1) is

applied to review a state court's application of *Strickland*:

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S.   ,   , 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at —. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at —, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied

*Strickland's* deferential standard.

*Richter*, 131 S. Ct. at 788.

The opinion of the Michigan Court of Appeals, at a minimum, presents a "reasonable argument" that Petitioner's trial counsel satisfied *Strickland's* standard.

Petitioner, here represented by new counsel, does not even attempt to address the rationales employed by the state appellate court for denying each of her allegations. First, with respect to the failure to call Dr. Cassin, Petitioner merely rehashes the argument she made to the state appellate court–that Dr. Cassin's letter alone required trial counsel to call him as a witness. The Michigan Court of Appeals, however, found that despite Dr. Cassin's seemingly favorable report, trial counsel spoke to Dr. Cassin before trial, and he stated that he would not be able to assist in the matter.  In fact, at the evidentiary hearing in the state court, Petitioner's trial counsel testified that after he had read the report, he spoke with Dr. Cassin and determined not to call him as a witness. Tr. 1-26-09, pp. 60-61. In other words, despite the contents of Dr. Cassin's letter, trial counsel determined after talking to him, that he would not be a beneficial witness.

As stated, under the *Strickland* standard, counsel's actions are presumptively reasonable. It was incumbent on Petitioner's appellate counsel to ascertain whether the conversation between Dr. Cassin and trial counsel allowed trial counsel to reasonably chose not to call him as a witness. In the absence of any record that the conversation did not provide such a legitimate reason, the conclusion that the Petitioner failed to

23

demonstrate her burden under *Strickland* was reasonable.

Next, with respect to trial counsel's failure to assert that Sowards caused Sean's death, Petitioner again presents this Court with the same arguments she presented to the state appellate court without addressing the appellate court's decision. Petitioner lists a number of witnesses who she claims would have testified to Sowards' violent actions towards her. She had an opportunity to call these witnesses and establish a record to back her claims in the state court evidentiary hearing, but failed to do so. Petitioner's appellate counsel was able to offer some support for the allegations by including police reports with his pleadings, but no evidence was admitted at the state court hearing to corroborate her claims. Moreover, as noted by the state appellate court, none of the allegations concerned what happened on the date of the incident, June 11, 2007, when Sowards was away from the house. Again, given Petitioner's failure to support her allegations at the state evidentiary hearing, the Michigan Court of Appeals reasonably rejected this claim.

The same thing holds true with respect to the rest of Petitioner's allegations of ineffective assistance of counsel. Petitioner simply does not address the reasonableness of the state appellate court's decision. For example, Petitioner asserts that trial counsel should have filed a motion for change of venue because of pretrial publicity. She supports this claim with a list of newspaper articles written about her case. The state appellate court, on the other hand, denied relief because the evidence indicated that none of the jurors had in fact heard about the case. This provided a reasonable basis for the state court

24

to reject the claim, and Petitioner offers no reason to undermine this rationale. Petitioner also argues that her statements to police were involuntary because of the emotional circumstances surrounding the interviews, and therefore, he counsel should have moved to suppress her statements.  The state appellate court, however, found that defense counsel allowed the statements to be admitted at trial as a matter of strategy. Trial counsel testified that Petitioner did not make any admissions during the interviews, and he thought that her emotional reaction on the tapes would benefit her defense. This testimony provided a reasonable basis for the state court to deny Petitioner relief.

Accordingly, Petitioner has failed to demonstrate that the state court adjudication of her ineffective assistance of counsel claim resulted in an unreasonably application of clearly established Supreme Court law. The claim is therefore without merit.

## B.

Petitioner next asserts that she was denied her right to a fair trial by prosecutorial misconduct. Specifically, she alleges that: (1) the prosecutor failed to disclose consideration given to Sowards for his testimony and then failed to correct his testimony when he testified that he did not receive any consideration, and (2) the prosecutor elicited evidence of Petitioner's pre-arrest and post-arrest silence. Neither of these claims merit habeas relief.

With respect to Petitioner's first allegation of prosecutorial misconduct, the deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. *Giglio v. United States*, 405 U.S. 150,

25

153 (1972). There is also a denial of due process when the prosecutor allows false evidence or testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959)(internal citations omitted). To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). A defendant must also show prejudice, which requires demonstrating "a reasonable probability of a different result." *Napue*, 360 U.S. at 271; *Banks v. Dretke*, 540 U.S. 668, 699 (2004).

Here, the Michigan Court of Appeals found that the prosecutor should have disclosed the promise to recommend a sentence within the guidelines for Sowards, but it denied relief because Petitioner could not demonstrate prejudice. This decision was reasonable. The evidence at trial established on the day that Sean was brought to the hospital, he had suffered a traumatic head injury. The force necessary to produce the injury was analogous to being thrown from a car, hit in the head with a baseball bat, of falling from a high-story window. Sowards' claim that he was not at home on the day of the incident did not come only from his testimony, but it was corroborated by evidence presented at trial from his employer and records from the auto-parts store he visited after work. While Sowards' testimony was certainly important, it was the evidence that Petitioner had a history of mistreating her son, refused to seek medical attention until Sowards arrived home, the bloody laundry and blood-stained carpeting and walls in Sean's bedroom, and her conduct and changing story after the

incident, that strongly implicated Petitioner. While the promise to recommend a guidelines sentence for Sowards certainly provided some degree of impeachment value, it would not have significantly undermined the prosecutor's case against Petitioner. It was therefore reasonable for the Michigan Court of Appeals to reject this claim on the basis that Petitioner had not demonstrated prejudice.

Next, Petitioner claims that the prosecutor elicited evidence of Petitioner's pre-arrest and post-arrest silence. With respect to pre-arrest silence, Petitioner's claim cannot be supported by clearly established Supreme Court law1. While the Supreme Court has held that evidence of post-*Miranda* warning silence violates a defendant's Fifth Amendment rights, *Doyle v. Ohio*, 426 U.S. 610, 617 (1976), evidence of pre-warning silence does not. *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980).

Although the Sixth Circuit has held that the use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination, see *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), there is no clearly established Supreme Court precedent establishing a constitutional bar to using a defendant's pre-arrest, pre-*Miranda* silence as evidence of guilt. As the Sixth Circuit has acknowledged, federal courts have reached different conclusions regarding the use of a defendant's pre-arrest silence:

---

[1]After the state courts adjudicated this claim against Petitioner, the United States Supreme Court held that prosecutors may use a defendant's pre-arrest silence as substantive evidence of his guilt if the defendant did not expressly invoke his right to remain silent. *Salinas v. Texas*, 133 S. Ct. 2174, 2179, 2184, 186 L. Ed. 2d 376 (2013); *Abby v. Howe*, 2014 U.S. App. LEXIS 1842, *18 (6th Cir. 2014).                -12-

The circuits that have considered whether the government may comment on a defendant's prearrest silence in its case in chief are equally divided. Three circuits have held that such use violates the privilege against self-incrimination found in the Fifth Amendment, relying principally upon *Griffin v. California*, 380 U.S. 609, 615 (1965). See *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir. 1987); *Coppola v. Powell*, 878 F.2d 1562, 1568 (1st Cir.), cert. denied, 493 U.S. 969 (1989); *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991), cert. denied, 503 U.S. 997 (1992); cf. *United States v. Caro*, 637 F.2d 869, 876 (2d Cir. 1981) ("Whatever the future impact of *Jenkins* may be, we have found no decision permitting the use of silence, even the silence of a suspect who has been given no *Miranda* warnings and is entitled to none, as part of the Government's direct case."; "[W]e are not confident that *Jenkins* permits even evidence that a suspect remained silent before he was arrested or taken into custody to be used in the Government's case in chief."). . . .

Three circuits, on the other hand, have reached the opposite conclusion. See *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991); *United States v. Zanabria*, 74 F.3d 590, 593 (5th Cir. 1996); *United States v. Oplinger*, 150 F.3d 1061, 1066-67 (9th Cir. 1998).

*Combs*, 205 F.3d at 282-83. Because there is no clearly established Supreme Court precedent requiring the suppression of pre-arrest silence, the state court's decision was not contrary to or an unreasonable application of clearly established federal law. Therefore Petitioner's claim does not provide grounds for a writ of habeas corpus.

With respect to the use of Petitioner's post-arrest silence, the Michigan Court of Appeals correctly rejected the claim on the grounds that Petitioner did not exercise her right to remain silent, but she agreed to give a statement to the police. "[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of the statements, defendant has not remained silent at all." *Anderson v. Charles*, 447 U.S. 404, 408 (1980). Because Petitioner chose to speak with the detectives,

28

the prosecutor's questions concerning her failure to ask about the welfare of Sean was not a comment upon Petitioner's post-arrest silence. Accordingly, the Michigan Court of Appeals reasonably rejected Petitioner's claims of prosecutorial misconduct.

C.

Petitioner's third claim asserts that the trial judge committed a series of errors. She asserts that:(1) the judge engaged in ex parte communications with a juror; (2) erroneously admitted prior bad acts evidence; and (3) omitted a stipulated jury instruction. These claims do not merit habeas relief.

With respect to the first allegation, the right of the accused to be present during all critical stages of a trial against her is fundamental. See *Rushen v. Spain*, 464 U.S. 114, 117 (1983). Ex parte communications are absolutely discouraged and a question from the jury should be answered in open court, after providing the defendant with an opportunity to be heard. *See Rogers v. United States*, 422 U.S. 35, 39 (1975); *United States v. Reynolds*, 489 F.2d 4, 7-8 (6th Cir. 1973). However, not every "ex parte conversation between a trial judge and a juror" violates the Constitution, *United States v. Gagnon*, 470 U.S. 522, 526 (1985), and an ex parte communication between the trial judge and a juror is subject to harmless-error analysis. See *Rushen*, 464 U.S. at 118-19; *Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1468 (6th Cir. 1993). There must be a reasonable possibility that the ex parte communications affected the verdict. *United States v. Paul*, 57 Fed. Appx. 597, 604 (6th Cir. 2003).

29

Here, the Michigan Court of Appeals reasonably found that Petitioner was not prejudiced by the communication between the trial judge and the juror. On the final day of the trial, a juror told the trial judge in chambers–apparently without either counsel being present–that the facts of the case were making her emotional and that she did not know whether she "can say guilty or not guilty." The judge reminded her of her oath and had her resume her place with the jury. The exchange was placed on the record and appears in the trial transcript. While this communication outside the presence of the parties was improper, it was reasonable for the state court to find that Petitioner was not actually prejudiced. The trial judge did not communicate anything to the juror that might have adversely affected Petitioner's trial. He simply reminded the juror of her oath and told her to continue to serve on the jury.

Next, Petitioner argues that the trial court erred in allowing admission of evidence concerning her prior conduct towards Sean. This claim does not provide a basis for granting habeas relief because it cannot be supported by clearly established Supreme Court law. Federal habeas courts do not review state-court rulings on state-law questions. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The admission of "prior bad acts" or "other acts" evidence under Michigan Rule of Evidene 404(b) against Petitioner at her state trial does not entitle herto habeas relief, because there is no clearly established Supreme Court law which holds that a state violates a habeas petitioner's due process rights by admitting propensity evidence in the form of "prior bad acts" evidence. See *Bugh v. Mitchell*, 329 F.3d 496, 512

(6th Cir. 2003).

Petitioner also asserts that the trial court erred by failing to read a version of the jury instructions that was stipulated to by the parties. He asserts that the jury instruction regarding the elements of felony murder might have misinformed the jury that Petitioner could be found guilty even if she did not directly cause the head trauma that killed Sean.

To obtain relief, Petitioner must show that the challenged instruction so infected the entire trial that the resulting conviction violates due process, not merely that the instruction was undesirable or erroneous. *Henderson v. Kibbe*, 431 U.S. 145, 154-55 (1977). Any ambiguity, inconsistency or deficiency in a jury instruction does not by itself necessarily constitute a due process violation. *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009). It is not enough that there might be some "slight possibility" that the jury misapplied the instruction. *Id*. at 191. Federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction may have been deficient in comparison to a model state instruction. *Estelle*, 502 U.S. at 72.

The challenged instruction reads as follows:

> To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that Crystal Conklin caused the death of [the child] and it-and that that is that [the child] died as the result of blunt head injuries. Second, that Crystal Conklin had one of these three states of mind: She intended to kill or she intended to do great bodily harm to [the child] or she knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of her actions. Third, that when she did the act that caused the death of [the child], Crystal Conklin was committing the crime of first-degree child abuse.

31

*Conklin*, 2010 WL 2384876, *7.

Petitioner has failed to show that the jury instructions did not adequately advise the jury of the required elements of felony-murder. Petitioner complains that the instruction allowed the jury to find "her contributively guilty as a bad mother for Sean's death by non-fatal injuries, as opposed to finding her to have the guilty intent of committing the actual fatal head injury itself." Petitioner's Brief, pp. 62-63. This argument ignores the final sentence of the instruction, that required the jury to find that Petitioner "did the act that caused the death." The fact that the trial court could have employed more precise language is not enough to warrant habeas relief. The language that was used was not so deficient so as to deny Petitioner her right to due process.

Therefore, none of the arguments Petitioner presents in her third habeas claim merit relief.

### D.

Petitioner next asserts that the evidence presented at trial regarding the intent elements of first-degree murder and first-degree child abuse was insufficient to sustain the jury's verdict.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction" is

whether the record evidence could reasonably support a finding of guilt
beyond a reasonable doubt. But this inquiry does not require a court to "ask
itself whether it believes that the evidence at the trial established guilt beyond
a reasonable doubt." Instead, the relevant question is whether, after viewing
the evidence in the light most favorable to the prosecution, any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted)

(emphases in original). This standard "must be applied with explicit reference to the

substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

"A sufficiency of the evidence claim is a 'steep climb' . . . ." *United States v. Ross*, 703

F.3d 856, 882 (6th Cir. 2012) (quoting *United States v. Stafford*, 639 F.3d 270, 273 (6th Cir.

2011)). Federal courts

apply two layers of deference in reviewing habeas claims challenging
evidentiary sufficiency. *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010)
(citing *Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009)). "First . . .
[they] must determine whether, viewing the trial testimony and exhibits in the
light most favorable to the prosecution, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt." *Brown*,
567 F.3d at 205 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).
"Second, even were [they] to conclude that a rational trier of fact could not
have found a petitioner guilty beyond a reasonable doubt, on habeas review,
[they] must still defer to the state appellate court's sufficiency determination
as long as it is not unreasonable." *Id.* (citing 28 U.S.C. § 2254(d)(2)).

*Moreland v. Bradshaw*, 699 F.3d 908, 916-17 (6th Cir. 2012).

The prosecution's theory was that Petitioner aided and abetted his co-defendants in

committing felony murder. Under Michigan law,

to establish first-degree felony murder, the prosecution was required to prove
an intent to kill, to cause great bodily harm, or to create a high risk of death or

33

bodily harm knowing that death or bodily harm will most likely result. MCL 750.316(1)(b); *Carines*, 460 Mich. at 758-759. Similarly, to establish first-degree child abuse, the prosecution was required to show that defendant knowingly or intentionally caused serious physical or mental harm. MCL 750.136b(2); *People v. Maynor*, 470 Mich. 289, 295; 683 NW2d 565 (2004).

*Conklin*, 2010 WL 2384876, *5.

The Michigan Court of Appeals accurately summarized the evidence as follows:

Defendant had a history of mistreating her son and giving his sister preferential treatment. Caring for her son appeared to be an annoyance to defendant, who had left the child in a playpen in a dark basement, in the garage, or in his car seat covered with a blanket when he was younger. Defendant admitted that she did not seek medical treatment for her son's various maladies, including his vision impairment. She also admitted that, at the time of her son's death, he could barely see. When her son was admitted to the hospital, he had numerous nonlife-threatening injuries, including bruising all over his body, a gash on his forehead that was healing, a deformed and possibly broken left index finger, and missing toenails. He had also suffered a traumatic and life-threatening brain injury that was caused by nonaccidental blunt force trauma. Dr. DeGraw testified that the child's head injuries could not have been caused by a household accident or fall and that they were more characteristic of being thrown from a car during an automobile accident, being struck with a baseball bat, or falling from a high-story window. Dr. DeGraw opined that any reasonable person would have realized immediately after the trauma that the child was seriously injured.

The evidence showed that on the day the child received his massive head injuries, Sowards left the home before 7:00 a.m. and went to work. When he left work at approximately 4:30 p.m., he went to his uncle's home to repair his truck before returning home. Police officers confirmed Sowards's whereabouts that day by talking to his employer, obtaining a copy of his time card, verifying the existence of a pay phone that Sowards used, talking to Sowards's uncle, and obtaining a copy of a receipt from an auto parts store. When Sowards arrived home, he discovered the child lying facedown on his bed, unresponsive, and barely breathing. Although defendant went with Sowards to the hospital, she did not go inside and left in the truck. She went to her uncle Matthew Conklin's home and told him that her son had fallen and that she thought that he was having seizures. Defendant then admitted that if

34

she went to the hospital, she would be arrested and her daughter would be removed from her care.

When the police arrived at defendant's home that night, they discovered a blood-splattered pile of laundry in the utility room that included children's bedding and items in the washing machine that smelled of vomit and contained blood spots. They also found dried blood on the carpet in the child's bedroom, on two of the bedroom walls, on the interior walls of the closet and closet door, and on the underside of his mattress. Moreover, police officers found an 8- to 12-inch metal pipe with a rubberized handle on the kitchen windowsill.

Further, defendant provided various explanations for her son's injuries and failed to sufficiently explain how his head injuries occurred. For example, defendant told Sowards that the injury to one of the child's toenails occurred when a Tonka truck fell on the toenail. In her statement to the police, however, defendant claimed that the missing toenails were caused by a fungus. Defendant also told her uncle at the hospital that her son's eye problems were caused because he was allergic to the medication that he was being administered. This explanation conflicted with evidence that the child had suffered chronic eye problems and, according to defendant, he could "barely see" at the time that he was admitted to the hospital.

Finally, defendant told Dr. DeGraw, Magnan, Detective Brian Kijewski, Detective Richardson, and Detective Marsee that after Sowards left for work on the morning on June 11, 2007, he did not return home until 7:00 or 8:00 p.m. This conflicted with defendant's trial testimony that Sowards returned home after work at approximately 4:30 p.m., screamed at the child, and left the child lying in his bed.

*Conklin*, 2010 WL 2384876, *5-6.

This Court agrees with the Michigan Court of Appeals that a rational trier of fact could conclude from the evidence taken in the light most favorable to the prosecution that Petitioner was guilty of felony-murder and first-degree child abuse. The evidence, viewed most favorably to the prosecution, established that Petitioner hit Sean on the head with enough force to cause his death. The intent element was satisfied because the medical

35

testimony established that the force used was equivalent to a being hit with a baseball bat, a car accident, or falling from a high-story window. A rational juror could have concluded from this testimony that Petitioner possessed the intent to cause great bodily harm or create a high risk of death when she struck her child in the head with that amount of force.

Petitioner therefore has no right to relief on the basis of his sufficiency of the evidence claim.

E.

Petitioner next argues that her statements to police were involuntarily made in violation of the Fifth Amendment. Specifically, she notes that she "was eight months pregnant, with her son in the hospital, under the duress of Soward's violence and threats, under constant interrogation or custody for two and a half days. The coercive force of the police interrogation began as soon as they arrived as [Petitioner's] house, and all of her statements from that point on were made involuntarily. . . ." Petitioner's Brief, pp. 68-69.

The Michigan Court of Appeals rejected this claim as follows:

> Defendant also contends that her statements to the police were involuntary. In determining whether a statement to the police was freely and voluntarily made, this Court reviews the totality of the circumstances surrounding the making of the statement. *People v. Cipriano*, 431 Mich. 315, 334 (1988); *People v. McPherson*, 263 Mich.App. 124, 137 (2004). The test of voluntariness is whether, based on the totality of the circumstances, "the confession is the product of an essentially free and unconstrained choice by its maker," or whether the accused's "will has been overborne and his capacity for self-determination critically impaired[.]" *Cipriano*, 431 Mich. at 333-334, quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). Factors to consider when making this determination include:

36

the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [Id. at 334.]

Defendant argues that her statements to the police were involuntary because she was young, emotionally devastated, had no prior experience with the criminal justice system, was detained for a lengthy period of time, was not advised of her *Miranda* rights, and was denied counsel. The record fails to support defendant's argument.

As previously indicated, defendant was not in custody when she gave her first statement to the police. Accordingly, she was not required to be advised of her *Miranda* rights. *Marsack*, 231 Mich.App at 374. Because she was not in custody, she was not detained and the record fails to show that she requested an attorney. In sum, the record does not support defendant's argument that her first statement to the police was involuntary.

The record also fails to show that defendant's second statement to the police was involuntary. As previously discussed, defendant was in custody at the time she made the statement and she validly waived her *Miranda* protections. Defendant admitted that the detectives gave her a coat because she was cold, and asked if she was hungry or thirsty. They then gave her pizza and something to drink. The detectives interviewed defendant for approximately three hours. She appeared calm and relaxed at the beginning of the interview and did not appear upset until she was informed that the child had died. Thus, the record fails to support defendant's argument that her second statement to the police was involuntary.

*Conklin*, 2010 WL 2384876, at *17.

The Fifth Amendment prohibits the prosecution's use of a criminal defendant's

37

compelled testimony. *Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985). The Due Process Clause of the Fourteenth Amendment likewise prohibits the admission at trial of coerced confessions obtained by means "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist. *Ledbetter v. Edwards*, 35 F. 3d 1062, 1067 (6th Cir. 1994)(citing *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976)). An involuntary confession may result from psychological, no less than physical, coercion or pressure by the police. *Arizona v. Fulminante*, 499 U.S. 279, 285-89 (1991); *Miranda v. Arizona*, 384 U.S. 436, 448 (1966).

In determining whether a confession is voluntary, the ultimate question for a court is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. at 112. These circumstances include:

1. police coercion (a "crucial element");
2. the length of interrogation;
3. the location of interrogation;
4. the continuity of the interrogation;
5. the suspect's maturity;
6. the suspect's education;
7. the suspect's physical condition and mental health;
8. and whether the suspect was advised of his or her *Miranda* Rights.

*Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

All of the factors involved in the giving of the statement should be closely scrutinized.

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

38

Based upon the totality of the circumstances in this case, it was objectively reasonable for the Michigan Court of Appeals to hold that petitioner's statement to the police was voluntary. See *McCalvin v. Yukins*, 444 F. 3d 713, 720 (6th Cir. 2006). The state court could reasonably conclude that there was no much police coercion during the interviews with Petitioner. There is no evidence of the police using any threats or intimidation to obtain Petitioner's statement. Certainly, the circumstances of the interrogations were emotional, but those circumstances were not the result of police coercion. They were caused by the fact that her son was in the hospital and she was being investigated for abuse. The first several interviews were conducted while Petitioner was not in custody, and therefore no *Miranda* warnings were required. During the last interview at the police station, the record indicates that Petitioner was advised of her rights and decided to waive them. The length of the final interrogation of three hours was not inordinate considering the circumstances of the case and the investigation. The first statements were made at Petitioner's home, two were made at the hospital, and the final one was made at the police station. The interrogations were made over the course three days, however, and Petitioner was only in police custody for seven hours when the final one began. While the suspect may have lacked maturity, advanced education, and she may have been in an emotional state, the circumstances were not so overbearing so as to require the state courts to find the statements to be involuntary.

Accordingly, the Michigan Court of Appeals rejection of this claim was not objectively unreasonable.

F.

Finally, Petitioner asserts that her convictions for both first-degree felony murder and first-degree child abuse violate the Double Jeopardy Clause because the child abuse charge served as the predicate felony for her felony-murder conviction.

The Michigan Court of Appeals, applying the test from *Blockburger v. United States*, 284 U.S. 299, 304 (1932), rejected this claim. The court reasoned that one, in the abstract could commit felony-murder without committing first-degree child abuse, and one could commit child abuse without committing murder. The court reasoned that each offence therefore contained at least one distinct element, and a defendant could be convicted of both offenses even if the child abuse conviction served as the predicate offense for the murder conviction. This determination was reasonable.

On the surface, Petitioner's claim makes intuitive sense: where first-degree child abuse is the predicate offense to a felony murder charge, one cannot commit the felony murder without also having committed the child abuse. In such a situation, punishing a defendant for both offenses seems to be a straightforward violation of the Double Jeopardy Clause. However, the "analytical approach of *Blockburger* . . . requires that the statutory provisions' required elements be viewed in the abstract." *United States v. Ehle*, 640 F.3d 689, 696 (6th Cir. 2011); *Gonzales v. Wolfe*, 290 Fed. Appx. 799, 808 (6th Cir. 2008). Here, in the abstract, it is possible to commit first-degree felony murder without also committing first-degree child abuse, i.e., by committing some other predicate felony. Thus, the court of appeals was

40

reasonable in concluding that the multiple punishments did not offend the Double Jeopardy Clause.

Moreover, even if the court of appeals were incorrect in its *Blockburger* analysis, Petitioner would not be entitled to relief. In the multiple punishment context, the question whether the Double Jeopardy Clause is violated is purely one of legislative intent. The *Blockburger* test is merely one method of divining that legislative intent, but it is not the sole one. See *Albernaz v. United States*, 450 U.S. 333, 340; *Missouri v. Hunter*, 459 U.S. 359, 367 (1983). Thus, if a legislature intends to authorize cumulative punishment under two statutes-even if those two statutes constitute the same "offense" under the *Blockburger* test-multiple punishments after a single trial are permissible. See *Hunter*, 459 U.S. at 368-369. As explained by the Sixth Circuit, "[e]ven if the crimes are the same under *Blockburger*, if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." *Banner v. Davis*, 886 F.2d 777, 781 (6th Cir. 1989).

In *People v. Ream*, 481 Mich. 223 (2008), the Michigan Supreme Court, applying its own *Blockburger* analysis, concluded that the Michigan legislature intended to authorize multiple punishments upon conviction for first degree felony murder and the underlying felony. Because the Michigan Supreme Court has made this determination of the Michigan legislature's intent, this "court's inquiry is at an end" and there is no double jeopardy violation. Accordingly, Petitioner is not entitled to habeas relief on this claim. See *Berry v.*

*Capello*, No. 2:10-CV-11398, 2012 U.S. Dist. LEXIS 138367, 2012 WL 4450049, at *8 (E.D. Mich. Sept. 26, 2012).

IV.

Before  Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if Petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll.§ 2254.

Petitioner has not demonstrated a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. The Court further concludes that Petitioner should not be granted leave to proceed in forma pauperis on

42

appeal, as any appeal would be frivolous. See Fed. R. App. P. 24(a).

V

Accordingly, it is ORDERED that the petition for writ of habeas corpus is DENIED.

It is further ORDERED that a certificate of appealability is DENIED.

It is further ORDERED that leave to proceed in forma pauperis on appeal is DENIED.


s/Paul D. Borman
Paul. D. Borman
United States District Judge

Dated:  February 14, 2014


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 14, 2014.


s/Deborah Tofil
Case Manager

43